**In re PIONEER FORD SALES, INC., Debtor.**

**Bankruptcy No. 8100985.**

United States Bankruptcy Court,
D. Rhode Island.

Jan. 5, 1983.

Richard S. Mittleman, Zietz, Mittleman & Webster, Providence, R.I., for Fleet Nat. Bank.

Kathleen Sullivan Murray, Carroll, Kelly & Murphy, Providence, R.I., for Ford Motor Co.

Joshua Teverow, Letts, Quinn & Licht, Providence, R.I., for Toyota Village, Inc.

## DECISION

ARTHUR N. VOTOLATO, Jr., Bankruptcy Judge.

Heard on the application of Fleet National Bank, a secured creditor, with which the debtor in possession Pioneer Ford Sales, Inc., joins, for an order authorizing the sale of the debtor's Ford franchise to Toyota Village, Inc. Ford Motor Company objects to the application.

The relevant facts, as determined after hearing, are as follows:[1] On April 2, 1981 a Ford Sales and Service Agreement was executed between Pioneer Ford Sales, Inc. (Pioneer), a Ford dealer in Bristol, Rhode Island, and Ford Motor Co. (Ford). On December 8, 1981 the two principals of Pioneer transferred all their outstanding capital stock to Manchester Ford Sales, Inc., and resigned as officers and directors of Pioneer. On the next day, December 9, 1981, Pioneer filed a Chapter 11 petition.

On December 14, 1981, this Court entered an order authorizing the execution of a financing agreement between Pioneer, the debtor in possession, and Industrial National Bank (now Fleet National Bank) by which Pioneer granted Fleet a security interest in virtually all of its assets. On August 27, 1982 Fleet, in an application in which the debtor in possession joined, sought an order authorizing the sale of the interests of Pioneer and Fleet in the Ford Sales and Service agreement dated April 2, 1981. Ford objects to the application, primarily on the ground that the requirements of 11 U.S.C. § 365 have not been fulfilled. Ford also seeks to terminate the franchise agreement.

Under the proposal, the assignee, Toyota Village, Inc. (Village), will pay $10,000 for the assignment of the Ford franchise, and will purchase all vehicle parts and accessories currently in the possession of Pioneer for approximately $75,000. If this Court refuses to authorize the assignment, Ford will repurchase some but not all of the Ford parts, and no parts or accessories of other manufacturers, and the recovery in that event would be in the area of $45,000 to $55,000.

---

1. This Opinion constitutes the findings of fact and conclusions of law required by Rule 752 of the Rules of Bankruptcy Procedure.

Fleet and Ford agree that the franchise agreement between Ford and the debtor in possession is an executory contract and that the proposed assumption and assignment of the franchise are governed by 11 U.S.C. § 365.[2]

Although the franchise provides that the agreement is "not transferable, assignable or salable by the Dealer," Ford's Exhibit 1, Preamble, Paragraph F, § 365(f)(3) explicitly invalidates such provisions,[3] and the legislative history indicates that "contractual provisions that permit termination or modification in the event of an assignment [are] contrary to the policy of this subsection." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 349 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 59 (1978), U.S.Code Cong. & Admin.News, pp. 5787, 5845.

Pioneer was in default to Ford in the amount of $15,369 as of September 24, 1982. Pursuant to § 365(b)(1), a debtor may not assume an executory contract until a default is cured (or adequate assurance is provided that it will promptly be cured) and any party suffering losses resulting from the default has been compensated (or adequate assurance of prompt compensation has been provided).[4]

John T. Saviano, the president and principal of the proposed assignee, testified originally that in his opinion his obligation to Ford would be approximately $2700, and that Fleet had agreed to cure the remainder of the default. Subsequently, however, Fleet assured the court that Village had agreed to pay "immediately . . . the Debtor's entire indebtedness to Ford." (Final Memorandum in Support of Application for an Order Authorizing the Sale of the Debtor's Ford Franchise to Toyota Village, Inc., at 2.) The Court concludes that the latter statement reflects the current agreement among Village, Fleet, and the debtor in possession, and that the assumption and any assignment of the franchise agreement are conditional upon payment to Ford by Village and/or Fleet of any amounts by which the debtor in possession is in default to Ford.

Section 365 also permits an executory contract to be assumed and assigned only if there is adequate assurance of the assignee's future performance.[5] Such assurance

---

2. Memorandum in Support of Application for an Order Authorizing the Sale of the Debtor's Ford Franchise to Toyota Village, Inc., at 2–3; Memorandum in Support of Ford Motor Company's Objection to Industrial National Bank's Application for Authority to Sell Ford Motor Franchise, at 4.

3. 11 U.S.C. § 365(f)(3) reads as follows:
Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

4. 11 U.S.C. § 365(b)(1) provides in part:
(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default . . . .

5. The relevant subsections of 11 U.S.C. § 365 read as follows:
(b)(1) If there has been a default in any executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
. . . .
(C) provides adequate assurance of future performance under such contract or lease.
. . . .
(f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

may be provided in part by the assignee's financial status. *In re Bronx-Westchester Mack Corp.,* 20 B.R. 139, 142 (Bkrtcy.S.D.N.Y.1982). Although the evidence is conflicting concerning the financial status of Village and of its sole stockholder, as well as the degree of success and/or profitability of Village's current operation, the Court finds that the applicant has sustained the burden of demonstrating that Village will be able to meet Ford's requirements. The testimony of Michael Tocci, Ford's franchising manager, that as of early October 1982, that year was the second highest profit year in history for New England Ford dealers, and that 179 of 195 current Ford dealers in the region are profitable, lends support to the argument that Village also can profitably operate the Ford franchise. Based on the record, we do not share Ford's pessimism. However, if Ford's prediction (that Village will be unable to perform the terms of the franchise agreement) proves to be correct, then Ford still has the right to terminate the agreement with Village.[6]

It is clear from § 365(f)(1), note 5 *supra,* that an executory contract may be assigned notwithstanding any provisions to the contrary either in applicable law or in the contract itself—such as the prohibition on assignment contained in paragraph F of the Preamble of the Ford Sales and Service Agreement (Ford's Exhibit 1). Ford argues, however, that the franchise agreement is "a non-assignable, personal contract under § 365(c)(1)(A)."[7] This subsection, which is specifically excepted from the provisions of § 365(f)(1), clearly pertains to "executory contracts that are personal in nature." *In re Bronx-Westchester Mack*

Corp., 20 B.R. 139, 143 (Bkrtcy.S.D.N.Y. 1982). In both the *Bronx-Westchester Mack Corp.* case and in *Varisco v. Oroweat Food Co. (In re Varisco),* 16 B.R. 634, 638 (Bkrtcy.M.D.Fla.1981), those courts found that the franchise agreements under consideration were not personal service contracts based on a special relationship between the parties. Indeed, in the case at bar, Ford took no action to terminate this alleged "personal contract" with Pioneer until September 15, 1982, despite a change of ownership in December 1981 which violated the terms of its franchise agreement. Its recent attempted termination, based on "a change of ownership and operating management without the Company's prior written consent," Ford's Exhibit 2, occurred only *after* the filing by Fleet of a "Notice of Intended Sale" to Village of all of the rights of Fleet and of the debtor in the franchise agreement.

The president and sole stockholder of Village testified that he is willing and able to fulfill the terms of the franchise agreement. Based on the record, and in view of Village's status as an established automobile dealership, located within 500 yards of the present site of the franchise in question, there is a very reasonable likelihood that Village is capable of complying with the terms of the franchise agreement. Here, as in *In re Bronx-Westchester Mack Corp.,* 20 B.R. at 143, "[t]here is no special personal relationship between the parties to the contract in question other than the dealer's ability to sell [the vehicles] and support the operations called for under the contract."

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

6. Ford's termination rights are found in section 17 of the Ford Sales and Service Agreement Standard Provisions (Ford's Exhibit 2).

7. Ford Motor Company's Memorandum of Fact and Law at 9.
   11 U.S.C. § 365(c)(1)(A) provides:

(c) The trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of right or delegation of duties, if—
(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties. . . .

After considering the record, the law, and the relative equitable considerations involved, this Court authorizes the assumption of the Ford Sales and Service Agreement by the debtor in possession, and the assignment of said agreement to Village, subject to the following conditions:

1. Village and/or Fleet will cure any default prior to the assignment of the franchise.

2. In view of the valid objection by Ford to the sale of Ford vehicles at a dealership known as "Toyota Village," the parties are requested to select an appropriate name for the new dealership. In the event that the parties are unable to so agree, then that question will be submitted to the Court for resolution, whereupon we will conduct a "Name the Dealership" contest.