In the Matter of: MIDWAY AIRLINES, INC., Midway Airlines (1987), Inc. and Midway Aircraft Engineering, Inc., Debtors.

The METROPOLITAN AIRPORTS COMMISSION, a Minnesota public corporation, Appellant,

v.

NORTHWEST AIRLINES, INC. and Sheldon L. Solow, bankruptcy trustee for the estate of Midway Airlines, Inc., Midway Airlines (1987), Inc. and Midway Aircraft Engineering, Inc., Appellees.

No. 92–3902.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1993.

Decided Oct. 4, 1993.

Michael B. Fisco, Steven W. Meyer, Keith W. Bartz, Oppenheimer, Wolff & Donnelly, Minneapolis, MN, Mark Leipold, Lois K. Winston, Oppenheimer, Wolff & Donnelly, Chicago, IL, and Thomas W. Anderson (argued), Metropolitan Airports Com'n, Minneapolis, MN, for appellant.

Sheldon L. Solow, Sachnoff & Weaver, Chicago, IL, for debtors.

Larry M. Wolfson, Timothy J. Chorvat (argued), and David P. Sanders, Jenner & Block, Chicago, IL, for appellees.

Before BAUER, CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

On March 25, 1991, Midway Airlines, Inc., and certain other affiliated entities, filed for bankruptcy under chapter 11 of the Bankruptcy Code. 11 U.S.C. §§ 101–1330 (hereinafter the Code). Midway ceased operations on November 13, 1991, and, two weeks later, converted its chapter 11 reorganization into a liquidation under chapter 7. A short time later, Sheldon L. Solow was appointed trustee to administer Midway's bankruptcy estate.

Before its demise, Midway ran scheduled airline service to and from Chicago's Midway Airport. Beginning in 1989, Midway leased Gate 43 at the Minneapolis/St. Paul International Airport (MSP Airport) from the Metropolitan Airports Commission (MAC), a public corporation organized under Minnesota law for the purpose of owning and operating aeronautical facilities in Minnesota including the MSP Airport. By the time Midway suspended operations, its obligations to MAC under the lease were in default.

As part of his efforts to liquidate Midway's assets, the trustee solicited bids for Midway's leasehold interest in Gate 43. Northwest Airlines, Inc., submitted the only bid. Northwest offered to cure all of Midway's defaults under the lease and to pay an additional $5,000. There is no dispute that

Northwest is a major tenant at MSP Airport.[1]

The trustee moved the bankruptcy court for authority to assume the lease and to assign it to Northwest. MAC objected on two grounds: (1) that applicable Minnesota law as well as the federal Airline Deregulation Act of 1978 excuse MAC from accepting performance of Midway's obligations under the lease from Northwest and (2) that permitting Northwest to assume the lease would be anti-competitive because of Northwest's dominant position at MSP Airport. The bankruptcy court overruled MAC's objections. MAC appealed to the district court which affirmed the bankruptcy court's decision. MAC now appeals to us. We affirm, but for reasons different than those expressed by the district court.

■ The question presented here is quite narrow: Does section 365 of the Code preclude the trustee from assuming Midway's lease for Gate 43 and assigning it to Northwest without MAC's consent? Section 365 gives a trustee in bankruptcy the authority either to reject or to assume executory contracts and unexpired leases. Ordinarily, a trustee may take either of these actions without the consent of the other party to the contract or lease and notwithstanding a provision in the applicable agreement that purports to restrict assignment. See 11 U.S.C. §§ 365(a) & (f)(1). This rather extensive power reflects the important consideration that the trustee should be able to abandon contracts that impose burdensome liabilities upon the bankruptcy estate, but should also be allowed to retain favorable contracts that benefit the estate. Benjamin Weintraub and Alan N. Resnick, *Bankruptcy Law Manual* ¶ 7.10 (3d ed. 1992). Section 365 thus advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.

See *In re L & S Industries., Inc.*, 122 B.R. 987, 993 (Bankr.N.D.Ill.1991), *aff'd sub nom. Williams v. Stefan*, 133 B.R. 119 (N.D.Ill. 1991), *aff'd*, 989 F.2d 929 (7th Cir.1993). The trustee's power, however, is not absolute.

■ Section 365(c) provides, in pertinent part, as follows:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such a contract or lease from accepting performance from or rendering performance to an entity other than the debtor ... whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment....

MAC is withholding its consent to the assignment of the gate lease to Northwest. As a result, it contends that the issue before us is whether there exists any "applicable law" that excuses MAC from accepting performance of the lease from an airline other than Midway.[2] In this respect, MAC relies heavily upon *In re Braniff Airways, Inc.*, 700 F.2d 935, 943 (5th Cir.1983), in which the Fifth Circuit held that the Federal Aviation Administration, in its capacity as operator of Washington National Airport, was excused from accepting assignment of a lease for a gate at that airport by Braniff's bankruptcy trustee.[3] We conclude, however, that ultimately we need not reach the issue raised by *Braniff*.

MAC points out that it is a public corporation "created by statute to coordinate and further the interests of aeronautics in the

---

1. The record discloses that MSP Airport is a primary "hub" for Northwest and that it leases 75 percent of the gates there.

2. The words "applicable law" in 365(c) mean "applicable non-bankruptcy law." *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28 (1st Cir.1984) (citing H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977, U.S.Code. Cong. & Admin.News 1978, p. 5787)).

3. According to the arguments of MAC and of the *amicus curiae*, Airports Council International—North America, *Braniff* indicates that government agencies and public corporations enjoy unusual, if not unique, discretion in approving the assignment of contracts and leases in bankruptcy if public policies are implicated.

State of Minnesota. . . ." MAC Br. at 5. To carry out this function, the State of Minnesota has endowed MAC with a broad spectrum of powers, including the authority to (1) acquire property, (2) sue and be sued and, most importantly for our purposes, (3) lease its property to others. Minn.Stat § 473.608 subds. 2, 4 & 15 (1992). On the basis of these statutory provisions, and others, MAC claims "the exclusive authority to lease space at MSP Airport." MAC Br. at 7. This assertion is not particularly controversial, and, in fact, is one that the trustee does not deny. But it is quite another matter whether these same provisions constitute "applicable law" within the meaning of section 365(c) allowing MAC to block the proposed assignment of the lease to Northwest.

Section 365(c) is an exception to the general rule that a bankruptcy trustee may freely assign and delegate a debtor's rights and duties under his executory contracts and unexpired leases.[4] Its purpose is rather narrow: to prevent a trustee from forcing a party to accept performance from, or provide performance to, someone other than the party with whom it contracted in those situations where the identity of the party is central to the obligation itself. *See, e.g., In re Bronx–Westchester Mack Corp.*, 20 B.R. 139, 143 (Bankr.S.D.N.Y.1982) (An "agreement which does not depend upon a special relationship between the parties is not within the reach of [the § 365(c)] exception."). The paradigmatic example of such an agreement is the so-called "personal service contract," a contract entered into on the basis of the "character, reputation, taste, skill, or discretion of the party that is to render [performance]." 3 E. Allan Farnsworth, Farnsworth on Contracts § 11.10, at 129 (1990). There can be little doubt, therefore, that, had MAC contracted with Luciano Pavarotti to sing in its passenger facilities in order to soothe the souls of weary travelers, it could not be compelled to accept performance from pop-star Michael Jackson in the event of the great tenor's bankruptcy. On the other hand, the payment of rent pursuant to a lease is hardly the type of performance that depends upon the identity of the party that is to perform, i.e., the lessee. *See In re Federated Department Stores*, 126 B.R. 516, 519 (Bankr.S.D.Ohio 1990). MAC contends that the § 365(c) exception should not apply exclusively to contracts involving "personal services." Specifically, it urges that § 365(c) should be available whenever there exists "an important public policy coupled with some legislative intent to excuse a non-debtor party from accepting performance from an entity other than the debtor." MAC Br. at 11.

Some courts have held that § 365(c) applies only to "personal service contracts." *See, e.g., In re Taylor Manufacturing, Inc.*, 6 B.R. 370 (Bankr.N.D.Ga.1980). Other circuits, however, have concluded that the provision need not be read so narrowly. *See, e.g., In re Matter of West Electronics*, 852 F.2d 79, 83 (3d Cir.1988); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir.1984) and *In re Braniff Airways, Inc.*, 700 F.2d 935, 943 (5th Cir.1983). Since the statutory language does not limit the applicability of § 365(c) exclusively to "personal service contracts," we agree with those circuits holding that it need not be so constrained. We find particularly persuasive the First Circuit's approach in *Pioneer Ford Sales*. There, observing the difficulty of determining which duties are nondelegable "personal services," the court concluded that "it makes sense to avoid this question and simply look to see whether state law would, or would not, make the duty assignable *where the contract is silent.*" 729 F.2d at 29 (emphasis supplied). The highlighted language is of singular importance in this case, because the lease is *not* silent as to assignment and delegation.

Contractual silence on the issue of assignment and delegation is, at least in

---

4. Technically speaking, a person assigns rights and delegates duties. 3 E. Allan Farnsworth, Farnsworth on Contracts § 11.1, at 58 (1990). The transfer of a person's interest in a lease, of course, involves both an assignment of a right (the right to occupy the property) and the delegation of a duty (the obligation to pay rent). When both rights and duties are transferred, it is not unacceptable to refer to "assignment of the contract·(or lease)," *Id.*, a convention we occasionally adopt.

bankruptcy, not dispositive.[5] Pursuant to section 365(c)(1)(A), if "applicable law" excuses a contracting party from accepting performance from a party other than the debtor, that party may prevent, by withholding its consent, the assignment of a debtor's executory contract or unexpired lease "whether *or not* such contract or lease prohibits or restricts assignment of rights or delegation of duties" (emphasis supplied). Moreover, contractual clauses and provisions of law that purport to limit or condition the assignment of contracts are generally invalid in bankruptcy. Section 365(f)(1) states, in pertinent part, that

> Except as provided in subsection (c) of this section, *notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law,* that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease. . . .

(emphasis supplied).[6] But the lease at issue here is neither silent about assignment nor restrictive of it. Rather, it contains a provision that explicitly contemplates assignment by a trustee in bankruptcy.

■ A section of the lease between Midway and MAC, bearing the appellation "Assignment, Subletting and Effects of Lessee Bankruptcy," provides as follows:

> The paragraphs above shall not apply to any valid assumption or assignment of this Agreement, the leased premises, or any part thereof, by a trustee, or by the AIR-LINE as a debtor in possession under section 365 of the Bankruptcy Code of 1978, as amended; *Provided* that adequate assurance of future performance as provided by Section 365 of the Bankruptcy Code of 1978, as amended, is to be provided, in writing, as a condition of the assumption or assignment of this Agreement.

R.O.A. 6 at 30. It would be exceedingly difficult to draft a provision that more clearly reflects an understanding that the lease may be assigned should Midway enter bankruptcy. In the light of this provision, MAC's objections to the proposed assignment lose all force. Since Midway has defaulted on the lease, MAC may demand that the trustee cure this default prior to the proposed assignment. 11 U.S.C. § 365(b)(1)(A). Also, MAC may require "adequate assurance" that Northwest will perform the obligations required of it under the lease. 11 U.S.C. § 365(b)(1)(C).[7] But, unless we entertain the rather far-fetched notion that MAC was acting contrary to law when it entered into the lease with Midway, MAC has contractually foresworn any right it may have had to object to the assignment of the lease by a bankruptcy trustee. Indeed, even if we accept MAC's contentions that Minnesota law allows it alone to weigh and balance the advantages and disadvantages of assignment, we nevertheless conclude that MAC has already come down in favor of assignment and cannot now object to the one proposed here. In fact, MAC has made no argument that federal or Minnesota law permits it to aban-

---

5. Outside of bankruptcy, silence may create a presumption that contractual rights may be assigned. *See, e.g., L.V. McClendon Kennels, Inc. v. Investment Corp. of So. Fla.,* 490 So.2d 1374, 1375 (Fla.App.1986) and *The Macke Co. v. Pizza of Gaithersburg, Inc.,* 259 Md. 479, 270 A.2d 645, 646 (Md.App.1970).

6. The reference to "applicable law" in both subsections (c) and (f) is confusing. Subsection (f) seems to invalidate all laws that limit the free assignability of contracts while subsection (c) allows a non-party debtor to invoke certain of these laws in order to prevent a proposed assignment. One way to reconcile these provisions would be to conclude that the laws referred to in subsection (c) are only those laws that prohibit the assignment of "personal service contracts." For the reasons previously discussed, we find this resolution less than satisfying. The First Circuit has reasoned that since subsection (c)(1) "refers to state laws that prohibit assignment 'whether or not' the contract is silent, while (f)(1) contains no such limitation," the laws referenced in subsection (f), and invalidated by it, are those that "enforce contract provisions prohibiting assignment." *In re Pioneer Ford Sales,* 729 F.2d at 29. In any event, the question of which laws are included in which subsection is of dispositive significance only if the contract at issue is silent as to assignability or contains a provision that in some way purports to limit assignment. Since neither condition exists in the present matter, our resolution of this issue must await a case that squarely raises it.

7. The quoted section of the lease goes on to provide what, at a minimum, will constitute "adequate assurance" that a proposed assignee will perform under the lease.

don its contractual commitments in these matters.

In its reply brief, MAC makes the sweeping statement that, "Any language in the Lease regarding assignment is irrelevant for purposes of section 365(c)(1)." Reply Br. at 9. MAC supports this assertion by quoting language from section 365(c)(1) to the effect that a trustee may not assign a lease if "applicable law excuses ... [a lessor] from accepting performance from ... an entity other than the debtor ... whether or not ... [the] lease ... prohibits or restricts assignment...." What MAC has overlooked, of course, is that the language of Midway's gate lease does not prohibit or restrict anything or *merely* fail to prohibit or restrict anything; instead, this language affirmatively relieves this gate lease assignment of lease provisions otherwise applicable. The language clearly contemplates assignment in bankruptcy, provided there are adequate assurances of future performance.

■ To the extent that Minnesota law may have conferred on MAC authority to adopt and enforce rules, regulations and ordinances, Minn.Stat. § 473.608, subd. 17 (1990), and to make policy with respect to airport gate leasing, Minn.Stat. § 473.608, subd. 15, MAC has, in this instance, exercised that authority affirmatively to approve assignability in the event of bankruptcy. In effect, the lease provision has the force of whatever law MAC may be empowered to make, or of whatever regulatory authority it may be empowered to exercise, with regard to the leasing of the Midway gate. MAC suggests that section 11 of its Ordinance 58, which requires written authorization from MAC for the undertaking of business or commercial activity at the MSP airport, is controlling. But to the extent that Ordinance 58 may be relevant here at all, it has been preempted by the clear terms of the lease, to which MAC is a party.

We are fully aware of the importance of maintaining competition in the airline industry. We are also aware of the alleged anticompetitive effect of domination of hub airports by particular airlines. *See generally* Alfred E. Kahn, *The Competitive Consequences of Hub Dominance: A Case Study,* 8 Rev. of Indus. Organizations 381 (1993). However, as between a specific, unqualified and unambiguous lease provision apparently designed to further the purposes of the Bankruptcy Code and a purported general policy of encouraging competition, having no concrete or specific embodiment here, we believe the lease provision must govern.[8]

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

8. MAC is certainly not the only agency asserting some obligation to encourage competition at MSP airport. *Cf.,* 11 U.S.C. §§ 365(f)(1) & (p) (providing that a trustee may not assign a debtor's unexpired airport gate lease if the debtor is an "affected air carrier").